**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE REPUBLIC OF IRAQ,**<br><br>**Petitioner,**<br><br>**v.**<br><br>**THE REPUBLIC OF TURKEY,**<br><br>**Respondent.** | **No. 23-cv-00978-SLS-ZMF** |

**REPORT AND RECOMMENDATION**

Petitioner Republic of Iraq ("Iraq") filed this action to confirm an award issued by an international arbitration panel pursuant to 9 U.S.C. § 207 and Article III of the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"). *See* Pet. for Confirmation, Recognition, and Enf't of Foreign Arbitration Award ("Iraq's Pet.") 1, ECF No. 1. Respondent Republic of Turkey ("Turkey") did not object to the confirmation but did argue that it, not Iraq, should be the award net-creditor. *See* Turkey's Resp. to Iraq's Pet. ("Turkey's Resp.") 1–3, ECF No. 14. For the reasons set forth herein, the Court recommends GRANTING Iraq's Petition.

## I. BACKGROUND

### A. Underlying Arbitration

The underlying dispute and arbitration are not at issue here, so only a brief overview of those facts is necessary. In 1973, Iraq and Turkey entered into a Crude Oil Pipeline Agreement for the supply and purchase of crude oil. *See* Iraq's Pet., Ex. A, Final Award ("Final Award") ¶¶ 1, 145–147, ECF No. 1-2. The subsequent agreements and amendments are now known as the Iraq-

Turkey Pipeline Agreements ("ITP Agreements"). *See id.* ¶ 1. The ITP Agreements were subject to arbitration by the International Chamber of Commerce ("ICC"). *See id.* ¶¶ 34–35.

On May 23, 2014, Iraq commenced arbitration against Turkey for breaches of the ITP Agreements. *See id.* ¶ 359. Turkey made counterclaims. *See id.* ¶¶ 19–21. On February 13, 2023, the ICC issued its Final Award, awarding both Parties damages for different breaches arising at different times.[1] *See id.* ¶ 826. The ICC awarded Iraq a pre-interest amount of $1,997,976,023.50[2] for Turkey's breaches in January to March of 2014 and since May 2014. *See id.* The ICC awarded Turkey a pre-interest amount of $526,585,537.45 for various breaches from 1990 to 2013. *See id.* The ICC "ORDER[ed] [Turkey] to pay forthwith to [Iraq] the sum of USD 1,471,390,486.05, after set off of the amounts . . . above, subject to appropriate adjustments for interest." *Id.*

Before issuing its Final Award, the ICC accepted argument on what the appropriate interest should be. *See id.* ¶¶ 796–97. Iraq "requested that the [ICC] award interest at a rate calculated for each month, equal to the yield on U.S. dollar-denominated Turkish government bonds with a maturity as close as possible to the award date." *Id.* ¶ 796. Turkey "requested interest on its counterclaims and submitted that the appropriate interest rate under French law was 0.90% as of April 2017." *Id.* ¶ 797.

The Final Award gave instruction on the interest calculation methodology for each Parties' award. *See id.* ¶¶ 802, 806. The ICC "ORDER[ed] [Turkey] to pay [Iraq] interest on the amount . . . above at the average annual US dollar denominated Turkish bond rate from 1 January of the year following which the amount was incurred, compounded annually to the date of this Award." *Id.* ¶ 826. The ICC "ORDER[ed] [Iraq] to pay [Turkey] interest on the amounts . . . above at the

[1] The arbitration language was English. *See id.* ¶ 34.

[2] All dollar figures are given in USD.

average annual US dollar denominated Turkish bond rate from 1 January of the year following which the amount was incurred, compounded annually to the date of this Award." *Id.* After adding this all up, the ICC "ordered Turkey to pay Iraq interest on amount due to be paid to Iraq after all amounts owed by Iraq to Turkey have been set-off." *Id.* (cleaned up).

On May 5, 2023, Turkey filed an application to set aside the ICC's Final Award to the Court of Appeal of Paris. *See* Pet'r's Notice of Suppl. Auth., Ex. A, Judgment ¶ 8, ECF No. 40-1. On March 10, 2026, the appellate court denied the appeal. *See id.* § IV.

B. Present Litigation

On April 10, 2023, Iraq began proceedings in this Court. *See* Iraq's Pet. at 1. The Parties initially relied on declarations of the Parties' counsels. *See* Iraq's Pet., Decl. James Lloyd Loftis ("Loftis Decl."), ECF No. 1–1; Turkey's Resp., Decl. Aloysius P. Llamzon ("Llamzon Decl."), ECF No. 14–1. Subsequently, both Parties retained financial experts. *See* Iraq's Reply in Supp. of Pet. for Confirmation, Recognition, and Enf't of Foreign Arb. Award ("Iraq's Reply") 8, ECF No. 23; Turkey's Surreply to Iraq's Pet. for Confirmation, Recognition, and Enf't of Foreign Arb. Award ("Turkey's Surreply") 1, ECF No. 24. Iraq's expert, Ms. Emery, calculated that Turkey owed Iraq an award of $565,201,053.67, plus post-award interest. *See* Iraq's Surreply in Supp. of Pet. for Confirmation, Recognition, and Enf't of Foreign Arb. Award ("Iraq's Surreply"), Supp. Expert Decl. of Annie Emery ("Emery Supp. Decl.") ¶ 7, ECF No. 28-4. Turkey's expert, Mr. Perkinson, calculated that Iraq owed Turkey an award of $912,372,148, plus post-award interest. *See* Turkey's Surreply, Expert Decl. of Gabriel Perkinson ("Perkinson Decl.") ¶¶ 84–86, ECF No. 24-1.

## II. LEGAL STANDARD

Judicial review of arbitration awards "is limited by design." *Duke Energy Int'l Peru Invs. No. 1 Ltd. v. Republic of Peru* (*Duke Energy II*), 904 F. Supp. 2d 131, 133 (D.D.C. 2012). A court's confirmation of an arbitral award "should entail nothing more than ministerial verification that the award is genuine." *Miminco, LLC v. Democratic Republic of the Congo*, 79 F. Supp. 3d 213, 218 (D.D.C. 2015). Interpretation of an arbitration award "must begin with its text." *American Postal Workers Union v. U.S. Postal Service*, 550 F.3d 27, 30 (D.C. Cir. 2008). When the plain language of an arbitral award is "readily intelligible, no further judicial inquiry is needed." *Duke Energy II*, 904 F. Supp. 2d at 134. If the text is unclear, courts then attempt to discern the arbitrator's intent. *See Duke Energy Int'l Peru Invs. No. 1 Ltd. v. Republic of Peru* (*Duke Energy I*), 892 F. Supp. 2d 53, 57 (D.D.C. 2012). The court may forgo enforcement if "the arbitrator's intent [is] 'hopelessly difficult' to determine." *Id.* (quoting *Ethyl Corp. v. United Steelworkers of Am., AFL-CIO-CLC*, 768 F.2d 180, 187 (7th Cir. 1985)).

## III. DISCUSSION

### A. Interest Calculation

The Parties' disagreement stems from the ICC's instruction for calculating interest. How the Court resolves that disagreement determines which party will receive payment. The ICC stated:

> As it is the Turkish government that is liable to pay most of the damages, the [ICC] finds it appropriate to award interest based on the *average annual yield* on U.S. dollar-denominated Turkish government bonds rate with a *maturity as close as possible to the date of this Award*. The [ICC] finds this to be a commercially sensible rate that will appropriately compensate the Parties for the losses suffered as a result of the various treaty breaches that have been found in this Award.

Final Award ¶ 801 (emphasis added). The ICC's intent is not "'hopelessly difficult' to determine" from this text. *Duke Energy I*, 892 F. Supp. 2d at 57. For that reason, the Court largely agrees with Iraq.

*i. The Average Annual Yield Should Be Calculated Each Year*

The Parties present different interpretations for how the "average annual yield" should be calculated:

- Iraq argues that the "average annual yield" should be calculated each year interest accrues. *See, e.g.*, Iraq's Reply, Expert Decl. of Annie Emery ("Emery Decl.") ¶ 7, ECF No. 23-1.
    - Iraq's interpretation results in Turkey owing Iraq $565,201,053.67, plus post-award interest. *See* Emery Supp. Decl. ¶¶ 32, 35.
- Turkey argues that the "average annual yield" should be calculated using the relevant bonds from the year when interest first accrues and then fixed for the duration of those bonds. *See, e.g.*, Perkinson Decl. ¶¶ 59–61. Turkey proposes recalculating the annual average if the initial relevant bond expired before the Final Award, whereupon the process would repeat by calculating a new annual average to be fixed using then available relevant bonds. *See id.*
    - Turkey's interpretation results in Iraq owing Turkey $912,372,148, plus post-award interest. *See id.* ¶¶ 84–86.

a. The ICC Required an Annual Interest Calculation

The ICC adopted Iraq's proposal in its Final Award. To start, Iraq's interest proposal during the arbitral proceedings is nearly identical to what the ICC ultimately adopted.

| **Iraq Proposal** | **ICC Final Award** |
|---|---|
| "[Iraq] respectfully requests that the Tribunal award interest at a rate calculated for each month, equal to the yield on U.S. dollar-denominated Turkish government bonds with a maturity as close as possible to the award date." Iraq's Surreply, Ex. A, Claimant's Memorial on the Merits ("Iraq's Proposal") ¶ 6.58, ECF No. 28-2 | "[T]he [ICC] finds it appropriate to award interest based on the average annual yield on U.S. dollar-denominated Turkish government bonds rate with a maturity as close as possible to the date of this Final Award." Final Award ¶ 801. |

The only difference is that the ICC decided to calculate interest on an annual basis instead of monthly. *See* Final Award ¶ 802. The ICC explained that "[w]hile [Iraq] requested that interest be calculated on a monthly basis, using *a rate calculated for each month* equal to the average yield on U.S. dollar-denominated Turkish government bonds rate, the [ICC] considers it more prudent and practical to calculate interest *on an annual basis*." *Id.* (emphasis added). In other words, the ICC adopted the core feature for rates to be recalculated and only changed the interval at which that occurs.

As part of its interest proposal to the ICC, Iraq submitted sample calculations for a six-year period. *See* Iraq's Surreply, Ex. B, ECF No. 28-3. These sample calculations calculated an average yield for each month.[3] *See id.* So, in considering Iraq's proposal, the ICC had access to sample calculations where the average annual yield was recalculated at a regular interval. Turkey correctly asserted that the ICC did not "explicitly" accept Iraq's sample calculations. Turkey's Surreply at

[3] Iraq's calculations were "prepared on the basis of the same methodology [as Iraq's original proposal to the ICC], adjusted for . . . using interest on annual basis rather than monthly basis." Emery Supp. Decl. ¶ 6.

9. But the ICC did not need to explicitly do so. The ICC's near complete adoption of Iraq's proposal implicitly demonstrates the ICC's acceptance of the sample calculations. *Cf. Stiltner v. Beretta U.S.A. Corp.*, 74 F.3d 1473, 1483 (4th Cir. 1996) ("the '[i]ncorporation of identical or *similar* language from an act with a related purpose evidences some intention to use it in a similar vein.'" (quoting *Doe v. DiGenova*, 779 F.2d 74, 83 (D.C. Cir. 1985)); *United Steelworkers of Am., AFL-CIO-CLC v. Smoke-Craft, Inc.*, 652 F.2d 1356, 1361 (9th Cir. 1981) (finding standing to proceed *implicit* in the arbitrator's award) (emphasis added).

The text puts any doubts about the ICC's intent to bed: "Turkey will be required to make a payment to Iraq once all interest has been calculated and the total amount owed to Turkey by Iraq has been set-off against the total amount owed by Turkey to Iraq." Final Award ¶ 807 (cleaned up). The ICC concluded by again ordering Turkey to pay Iraq "interest on the amount due to be paid to [Iraq] after all amounts owed by [Iraq] to [Turkey] have been set-off." *Id.* ¶ 826. From this, the ICC stated its intent for a method of calculation that results in a net sum to Iraq. *See id.* And an annual calculation—not a fixed rate calculation—results in a net sum to Iraq. *See* Emery Supp. Decl. ¶¶ 6–7.

Turkey's expert argues that the average annual yield is "unrelated to the question of whether the yield should be held constant . . . or recalculated annually." Perkinson Decl. ¶ 95. Mr. Perkinson posits that the ICC's decision to "group damages annually, rather than awarding damages separately for each individual instance of loss" implies that the ICC recognized that "[u]sing an annual average smooths out any temporary spikes or dips in the interest rate, and ensures that the average annual yield is representative of rates throughout the year in which damages were incurred." *Id.* But expert interpretation is subordinate to textual review. *See American Postal Workers Union*, 550 F.3d at 30. And the basis for annual calculation here is the text of the Final Award, not the fact that ICC grouped damages. As such, the interest rates should be calculated annually.[4]

b. The ICC Did Not Intend for a Fixed Rate

1. The Outcome the ICC Required is Irreconcilable with a Fixed Rate

Turkey's interpretation is that the ICC ordered a fixed rate—not a rate calculated annually. Under a fixed rate scheme, Turkey would receive the net sum. *See* Perkinson Decl. ¶ 84. But this is barred by the text. The Final Award requires a net sum to Iraq. *See* Final Award ¶¶ 807, 826. Because the plain language requiring net-payment to Iraq is "readily intelligible, no further judicial inquiry is needed." *Duke Energy II*, 904 F. Supp. 2d at 134. Accordingly, the Court rejects Turkey's method as contrary to the text.

[4] Turkey also argues that it is "telling[]" that Iraq and its expert never referenced a "floating" or "variable" annual rate. Turkey's Surreply at 4, 8. But these are the terms Turkey uses to describe Iraq's method, not terms that appear in the Final Award. *See* Final Award ¶ 802. The Court is not persuaded by Turkey giving Iraq's method a name and then calling foul when Iraq does not use those names.

Turkey counters that the Court should not consider the ICC's net sum language because it was based on an "assumption," not "clear intent." Turkey's Surreply at 10. Turkey argues this was because the "[ICC] did not purport to actually carry out any calculation of interest, nor could it have done so." *Id.* And that is because the ICC "had neither the necessary expertise nor the necessary data to carry out these calculations." *Id.* Yet Turkey did not object to confirming the Final Award. *See, e.g.*, Turkey's Resp. at 1. Likewise, Turkey was careful to avoid stating the ICC miscalculated the Final Award. *See, e.g.*, Turkey's Surreply at 10. But Turkey's argument here is just that: a suggestion of miscalculation of the net sum. Turkey cannot succeed on this argument without the Court refusing to confirm the Final Award on the grounds that the ICC miscalculated and then confirming an altered award.

But this Court lacks the authority to do that. *See Miminco*, 79 F. Supp. 3d at 218. First, the Court's power to confirm is "nothing more than ministerial verification that the award is genuine." *Id.* Altering the Final Award would exceed this power. Second, grounds to refuse confirmation of a foreign arbitration award under the New York Convention "do not include miscalculations of fact or manifest disregard of the law." *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844, 851 (6th Cir. 1996); *see also G.E. Transp. S.P.A. v. Republic of Albania*, 693 F. Supp. 2d 132, 137 (D.D.C. 2010) (stating the grounds for refusal without including miscalculation or mistaken assumption). Third, Turkey's argument rests on a speculative assumption based on the Final Award not explaining what historical rates on which it relied. But arbitrators are not required to explain their awards with such detail, *see Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1179 (D.C. Cir. 1991), or the basis for them, *see Wilko v. Swan*, 346 U.S. 427, 436 (1953). So, the ICC's lack of explanation here is not a problem. *See Kanuth*, 949 F.2d at 1179; *Wilko*, 346 U.S. at 436. Fourth, even if true, the mere fact the ICC made an assumption is not sufficient to deny the

Final Award. *See Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.* (*Waterside*), 737 F.2d 150, 153 (2d Cir. 1984). In *Waterside*, the court considered whether an international arbitration confirmation would be contrary to public policy because it was based on allegedly contradictory testimony. *See id.* at 151–52. The court concluded that courts "determin[ing] whether alleged inconsistencies actually exist and how significant they are . . . would render the allegedly simple and speedy remedy of arbitration a mockery." *Id.* at 152–153. Moreover, the court refused to deny confirmation of the award "even if the arbitrators had been unaware of [certain] testimony." *Id.* at 153. Finally, the ICC had the necessary expertise and data to carry out any calculations. Both Turkey and Iraq agreed to source the necessary historical yield from Bloomberg. *See* Emery Decl. ¶ 4; Perkinson Decl. ¶ 69. Turkey has not provided any evidence that the ICC could not access that data. As to the apparent "expertise" of the ICC to make such calculations, the 265 pages of the Final Award speaks firmly to its qualifications. Not to mention their judges are kind of a big deal.[5] "This Court will refrain from questioning the qualifications of experienced arbitrators to hear different kinds of claims." *Trividia Health, Inc. v. Nipro Corp.*, No. 20-cv-8450, 2021 WL 5910437, at *3 (S.D.N.Y. Dec. 10, 2021).

2. The Text Does Not Support a Fixed Rate

The text Turkey relies on for a fixed rate scheme is unavailing. Turkey claims that a fixed rate is consistent with the "requirement that the bond used must have a maturity date as close as

[5] The arbitrators' long and distinguished careers speak for themselves. *See* Audrey Kunycky, *A Renowned International Arbitrator, New Zealand Attorney Sir David Williams LL.M. '66, Looks Back at His Harvard Law Roots*, HARV. LAW TODAY (Aug. 30, 2023), https://hls.harvard.edu/today/a-renowned-international-arbitrator-new-zealand-attorney-sir-david-williams-ll-m-66-looks-back-at-his-harvard-law-roots/ [https://perma.cc/2QR2-58ER]; Magdalene Coll., Univ. of Cambridge, *Sir Christopher Greenwood*, https://www.magd.cam.ac.uk/people/christopher-greenwood [https://perma.cc/N3DW-XB2T]; U.N. Audiovisual Library of Int'l Law, *Judge Peter Tomka*, https://legal.un.org/avl/pdf/ls/Tomka_bio.pdf [https://perma.cc/5YSU-F8Y5].

possible to the Award date" because "the [ICC]'s expressed preference for using the yield on a long-term bond with a maturity date near the Award loses much of its meaning unless the bond is assumed to be held to maturity." Perkinson Decl. ¶ 47. But the ICC's expressed preference as to maturity does not lose much of its meaning if the bonds are not held to maturity for two reasons. *See* Turkey's Surreply at 11–12. First, Iraq—like Turkey—selects bonds with a "maturity as close as possible to the date of th[e] Award." Emery Decl. ¶ 15 (quoting Final Award at ¶¶ 801, 826). Thus, Iraq's bonds are also long term. Second, whatever meaning "is lost" by using Iraq's plan for long-term bonds to calculate an average each year is meaning that Turkey reads in, not what the text says. The Final Award does not state that a fixed rate is the only way to be consistent with the yield on a long-term bond. Far from it: the only fixed rate that appears in the text is Turkey's proposal for a French statutory rate, which the ICC expressly did not adopt. *See* Final Award ¶¶ 797, 800 ("The Tribunal does not consider that the default interest rate under French law (as proposed by [Turkey]) is appropriate in the present case.").

Turkey next argues that the dictionary definition of "average" supports its interpretation of a fixed value for the average annual yield because an average "is a single value." Turkey's Surreply at 8. The Court is not persuaded. First, for the reasons discussed above, the text reveals an intent for annual calculation. And the text controls. *See American Postal Workers Union*, 550 F.3d at 30. Second, the dictionary definition of "average" does not require Turkey's interpretation. Iraq's interpretation is also consistent with the definition of "average" because it uses an average with a single value for each year. *See, e.g.*, Iraq's Surreply at 5. That average changes each year, but that does not negate that it is an average. Indeed, Turkey's approach demonstrates an average can change values. For older damages, Turkey proposes replacing the initial fixed rate with another when the underlying bonds expire. *See, e.g.*, Perkinson Decl. ¶ 61. This in turn changes the average

from what was initially calculated for some rates. *See id.* Thus, under either interpretation, there is not a permanent single value for the "average" yield.

c. Expert Testimony Does Not Move the Needle

Turkey's expert asserts an economic-investment approach to justify a fixed rate approach. *See* Turkey's Surreply at 11–15. Mr. Perkinson relies on two pieces of text: (i) "this was the rate of interest that [Iraq] would have earned had it received the *fair market value* of the crude oil in each month, and invested it in Turkish government bonds (which by definition carry the same credit risk as [Turkey]'s compensation obligation)," *id.* at 11 (emphasis added) (citing Final Award at ¶ 796); and (ii) "yield . . . to maturity." *Id.* at 12–13. Mr. Perkinson interprets these two excerpts as requiring a fixed rate approach because it reflects investors' ex ante expectation for returns. *See id.* at 11–15.

As to the first cite, the ICC never said that "fair market value" requires a fixed rate. Final Award ¶ 796. Similarly, as to the second cite, the ICC never said "yield . . . with a maturity as close as possible to the date of th[e] Award" requires a fixed rate. *Id.* ¶ 801. Nor does the text state that the rate used must have been practically possible purchases, *see id.* ¶ 799–807, as Turkey argues, *see* Turkey's Surreply at 12. Even if the text endorses economic-investment principles, the text makes no indication that this requires a fixed rate. Rather, what the text mandates is "calculat[ing] interest *on an annual basis*." Final Award ¶ 802 (emphasis added).

d. The Court Does Not Have the Authority to Confirm Pre-Judgment Interest Inconsistent with the Final Award

Turkey's claim that the Court has authority to award pre-judgment interest independent of the text of the Final Award also fails. *See* Turkey's Surreply at 23. To make this argument, Turkey relies on *Waterside*. *See id.* (citing 737 F.2d at 153). There, the Second Circuit permitted a court to award post-award, pre-judgment interest. *See Waterside*, 737 F.2d at 153–54. This was because

the arbitrators "lacked the power to grant such interest." *Id.* at 154. As such, "[the court] need not fear that the arbitrators considered the issue and determined that the equities of the case did not call for the grant of interest." *Id.*; *see also Ministry of Def. & Supp. for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1103 (9th Cir. 2011) (finding that the absence of arbitrators' authority to grant post-award, pre-judgment interest allowed the court to award such interest).

However, unlike the arbitral panel in *Waterside*, *see* 737 F.2d at 154, the ICC had the authority to award pre-judgment interest. *See* Final Award ¶ 799 ("The [ICC] has the power to grant a party interest under international law principles in order to ensure full reparation for the injury sustained."); *see also DM Construtora de Obras Limitada v. Tupi B.V.*, No. 25-cv-7493, 2026 WL 1831400, at *13 (S.D.N.Y. June 25, 2026) (confirming the pre-judgment interest the ICC authorized). Indeed, the ICC considered the issue of such interest, as demonstrated by the 21 paragraphs in the Final Award referencing it. *See* Final Award ¶¶ 201, 260, 270, 276, 553, 662, 795–807, 816, 826. Moreover, *Waterside* is not binding on this Court. Indeed, another court in this District "decline[d] to graft new [pre-judgment interest] requirements onto the award's plain terms given that a court's confirmation of an [arbitration] award should entail nothing more than ministerial verification that the award is genuine." *Miminco*, 79 F. Supp. 3d at 218. That court further noted that "courts awarding post-award, pre-judgment interest on [arbitration] awards have done so when the award itself provided for such interest." *Id.*; *see also Cont'l Transfert Tech. Ltd. v. Fed. Gov't of Nigeria*, 932 F. Supp. 2d 153, 164 (D.D.C 2013), *aff'd*, 603 F. App'x 1 (D.C. Cir. 2015) ("[A] district court's discretion to grant prejudgment interest 'must be exercised in a manner consistent with the underlying arbitration award.'"). This Court likewise declines to grant itself

the authority to add pre-judgment interest for an arbitral award when "the award itself [did not] provide[] for such interest." *Miminco*, 79 F. Supp. 3d at 218.

*ii. The Relevant Bonds Are All Those Beginning After January 1 of the Year Following Each of the Damages*

a. The Average Annual Yield Should Be Calculated Using Bonds Available the Year Interest Accrues, Not the Year Before

The Final Award requires interest to accrue at a rate calculated from certain bonds. The Parties disagree on what time frame to use to select the bonds to calculate the average annual yield. Iraq argues that the interest should be calculated using the bonds available when the interest is to be calculated. *See* Iraq's Surreply at 15. Because the ICC set interest to begin accruing "from 1 January of the year following which the amount was incurred," the relevant bonds are those of the year after the damages. *Id.* at 3–5 (quoting Final Award ¶ 826). Turkey argues that the relevant bonds are those preceding "January 1 of the year after the relevant damages were incurred." Turkey's Surreply at 17. Turkey argues that the "year following" text only indicates the date of accrual and that a rate from the year of damages is more consistent with the investment thesis. *See id.* at 16–18.

Turkey's interpretation is inconsistent with the text. Turkey is correct that the language in ¶ 826 of the Final Award sets when interest is to start accruing. *See id.* at 17. But that is all this language does. No additional language was required to say that interest should be calculated using the present interest rate. The present interest rate is the default. *See, e.g.*, *Cont'l Transfert Tech. Ltd.*, 932 F. Supp. 2d at 166–67 (applying the average prime rate available during the period interest accrued for an award silent on pre-judgment interest). "[I]t would not be correct for an amount set as of January 1 of a given year and starting to accrue interest as of that date to bear interest at the rate determined for the preceding year." Emery Decl. ¶ 11. Turkey attempts to create

textual ambiguity to allow an opening for its interpretation. But "[a]mbiguity [] requires something more substantial than a disagreement between the parties." *Duke Energy I*, 892 F. Supp. 2d at 57. No text in the Final Award supports Turkey's position. Thus, the average annual yield should be calculated using bonds from the corresponding year.

b. The ICC Did Not Exclude Bonds with Options

The Parties argue whether certain types of bonds with options should be excluded from the average. Iraq argues that "put" and "call" bonds should not be used in the average because their value is different from other bonds. Iraq's Surreply at 20–21. But there is nothing in the text of the Final Award to support this distinction. The ICC's requirements for the relevant bonds were limited to "U.S. dollar-denominated Turkish government bonds rate with a maturity as close as possible to the date of this Award." Final Award ¶ 801. Thus, the relevant bonds shall include bonds with options. *See Duke Energy I*, 892 F. Supp. 2d. at 57–58.

B. The Court Needs More Information to Confirm a Discrete Number

The Court does not currently have a calculation consistent with its findings. Consequently, the Court declines to endorse a discrete number that Turkey must pay Iraq at this time.[6]

## IV. RECOMMENDATION

For the reasons stated, Iraq's Petition to confirm the Final Award should be GRANTED.[7]

---

[6] The Parties have alleged computational errors. *See* Perkinson Decl. ¶ 88–93; Emery Supp. Decl. ¶ 26. But the Court need not address those give that a new calculation is needed.

[7] The Parties are hereby advised that, under the provisions of Local Rule 72.3(b) of the U.S. District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within fourteen days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections. The Parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the

Date: September 23, 2026

Zia M.Faruqui

Digitally signed by Zia M.Faruqui
Date: 2026.09.23 14:29:34 -04'00'

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

---

District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140, 144–45 (1985).